## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

PROGRESSIVE EXPRESS INSURANCE COMPANY

*Plaintiff, Counter Defendant -Appellee,*

vs.

KARINA MONASTERIO, *Defendant, Counter-Plaintiff, Cross-Plaintiff Appellant*,

And UBER TECHNOLOGIES INC.,
and RASIER-DC, LLC *Defendants- Appellees*

Appeal from the United States District Court for the Southern District of Florida

No. 23-61354-CV-MIDDLEBROOKS

_____

## APPELLANT'S OPENING BRIEF

_____

H. Clay Roberts, Esq.
Javier A. Basnuevo, Esq.
Roberts, Basnuevo & Macias, P.A.
113 Almeria Avenue
Coral Gables, FL 33134
Tel: 305-442-1700
*Attorneys for Appellant Karina Monasterio*

**Case No. 24-11256**
**Progressive Express Ins. Co. v. Monasterio**

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

In compliance with Eleventh Circuit Rule 26.1-1, Appellant, KARINA

MONASTERIO, submits the following list of interested persons and entities:

Adams, Esq. Verasa Jones

Augustin-Birch, Hon. Magistrate Judge Panayotta D.

Basnuevo, Esq. Javier A.

Boyd & Jenerette, P.A.

Dahl, Esq. Patrick D.

Evanson, Esq. Blaine H.

Fornaris, Esq. Martha D.

Fornaris Law Firm, P.A.

Franz, Esq. Kevin D.

Gibson, Dunn & Crutcher, LLP

Gooden, Esq. Kansas R.

Middlebrooks, Hon. Judge Donald M.

Monasterio, Karina

Morgan & Akins, PLLC

Progressive Express Insurance Company

Raiser-DC, LLC

Roberts, Esq. H. Clay

Roberts & Basnuevo, P.A.

Roig Lawyers

Middlebrooks, Hon. Judge Donald M.

Monasterio, Karina

Morgan & Akins, PLLC

UBER Technologies, Inc.

## STATEMENT REGARDING ORAL ARGUMENT

Appellant requests oral argument. This appeal presents issues of first impression, both in this Circuit and in Florida. The outcome of this appeal will affect millions of Floridians and may dictate whether potentially thousands of drivers and passengers in Florida go unprotected by uninsured/underinsured motorists' coverage. Counsel believes that the Court's disposition of this case will be aided by oral presentations.

# TABLE OF CONTENTS

Certificate of Interested Persons ....................................................... A

Statement Regarding Oral Argument……………………………………i

Table of Contents…………………………………………………………..ii

Table of Citations…………………………………………………………iv

Jurisdictional Statement…………………………………………………1

Statement of the Issues…………………………………………………..2

Statement of the Case……………………………………………………4

I. Statement of the Facts…………………………………………..4

a. Uber accepts Monasterio's services and provides TNC insurance through Progressive Express Insurance Company………………………………………4

b. The collision on Interstate 95………………………………………………6

II. Proceedings Before the District Court………………………7

III. Standard of Review………………………………………………9

Summary of the Argument…………………………………………………9

Argument……………………………………………………………………11

I. Florida's Transportation Network Company Act requires that businesses providing transportation services through an online application secure uninsured/underinsured motorist coverage for their drivers………………..11

a. Florida's TNC Act regulates the rideshare market with specificity to provide uniform guidelines for businesses throughout the state………………………..11

b. Florida Transportation Network Act must be read to give meaning to each of its provisions……………………………………………………………………17

c. The District Court's interpretation of the Transportation Network Act leaves thousands of Floridians without adequate insurance………………………27

II. Uber and Rasier-DC, violated the law by refusing to provide legally mandated indemnification……………………………………………………………………31

Conclusion……………………………………………………………….……..33

Certificate of Compliance……………………………………………34

Certificate of Service…………………………………………………...……34

# TABLE OF AUTHORITIES

**Cases**

*Alexdex Corp. v. Nachon Enterprises, Inc.*, 641 So.2d 858, 861 (Fla. 1994) .........24

*Am. Home Assurance Co. v. Plaza Materials Corp.*, 908 So.2d 360 (Fla. 2005) . 24, 25, 28

*Breedlove v. Earthgrains Baking Companies, Inc.*, 140 F.3d 797 (8th Cir. 1998) ..23

*Byars v. Coca-Cola Co.*, 517 F.3d 1256, 1263 (11th Cir. 2008)..............................9

*Checker Cab Operators, Inc. v. Miami-Dade County*, 899 F.3d 908 (11th Cir. 2018) ........................................................................................16

*Edmond v. United States*, 520 U.S. 651, 657 (1997)...............................................18

*Fla. Dept. of Environmental Protection v. ContractPoint Florida Parks, LLC*, 986 So.2d 1260, 1265 (Fla. 2008) ...............................................................................18

*Florida International University Board of Trustees v. Florida National University, Inc.*, 830 F.3d 1242 (11th Cir. 2016) ....................................................................9

*Highmark Inc. v. Allcare Health Management System, Inc.*, 572 U.S. 559, 563 (2014)...................................................................................................................9

*Kelly v. Sabretech, Inc.*, 106 F. Supp.2d 1283, 1287 (S.D. Fla. 1999)...................23

*Mercury Ins. Co. of Florida v. Anatkov*, 929 So.2d 624 (Fla. 3d DCA 2006) ........27

*Robbins v. Garrison Prop. & Cas. Ins. Co.*, 809 F.3d 583, 587 (11th Cir. 2015)...24

*Tug Allie-B, Inc. v. United States*, 273 F.3d 936, 948-49 (11th Cir. 2001).............23

*United Petro/Energy Corp. v. U.S.*, 846 F.Supp. 993, 997 (S.D. Fla. 1994) .......... 19

**Statutes**

28 U.S.C. §1291 ................................................................................................... 2

28 U.S.C. §1332 ................................................................................................... 1

Fla Stat. §627.748 ....................................................................................... passim

Fla. Stat. §627.727 ...................................................................................... passim

**Treatises and Articles**

ANTONIN SCALIA, COMMON LAW COURTS IN A CIVIL LAW SYSTEM: THE ROLE OF

UNITED STATES FEDERAL COURTS IN INTERPRETING THE CONSTITUTION AND

LAWS, IN A MATTER OF INTERPRETATION: FEDERAL COURTS AND THE LAW, 23

(Amy Gutmann ed., 1997) ................................................................................ 20

Carlos Ibarcena, *Going Under the Hood: The Winners and Losers of Florida's*

*Transportation Network Companies Law*, 42 NOVALR 45, 47 (Fall 2017) ....... 29

SINGER, NORMAN AND SINGER, J.D. SHAMBIE, STATUTES AND STATUTORY

CONSTRUCTION, §51.2 (2012) ............................................................................ 19

SUMMERS, ROBERT, STATUTORY INTERPRETATION IN THE UNITED STATES,

Interpreting Statutes, 434-441 (1991) ............................................................... 20

## JURISDICTIONAL STATEMENT

In July 2023, Progressive filed a declaratory action against Karina Monasterio, Rasier-DC, LLC, and Uber Technologies, Inc., pleading complete diversity of the parties to establish jurisdiction in the Southern District of Florida under 28 U.S.C. §1332(a)(1). Doc. 1 -Pg 2. On September 15, 2023, Monasterio filed her answer and affirmative defenses; she also asserted a counterclaim against Progressive and crossclaims against Uber and Rasier— asserting that the same statutes relied upon by Progressive established Monasterio's right to uninsured/underinsured motorists' coverage. Doc. 22.

This appeal follows the entry of final judgment by the district court on March 27,2024 in favor of Progressive and against Karina Monasterio, Rasier-DC, LLC and Uber Technologies. Doc. 54. Monasterio filed her notice of appeal on April 19, 2024. Doc. 60. Although the March 27 Final Judgment did not expressly mention Monasterio's crossclaims against Uber and Rasier, the district court's "Order Closing Case" clarified that "Monasterio's claim for declaratory judgment as plead is already fully adjudicated." Doc. 63- Pg 3. The district court specified that its Final Judgment Order "included a declaration on the requirements of subsection (7)(d) of the Transportation Network Company Act, Fla Stat. §627.748." *Id*. Finally, the district court reasoned that Monasterio's filing of a notice of appeal divested the district court of jurisdiction over this matter. It

1

"forewarned" that Monasterio's claims were resolved, giving finality to its March 27 Final Judgment which in the district court's view, disposed of all parties claims through its Order on Motion for Summary Judgment. Doc. 52 and Doc. 60.

It is apparent that the March 27 Final Judgment terminated the action such that no judicial labor remained for the district court. This Court has jurisdiction over the appeal pursuant to 28 U.S.C. §1291 because this appeal is taken from a final decision of the district court.

## <u>STATEMENT OF THE ISSUES</u>

On appeal, Monasterio presents the following issues to this Court:

1.  Whether the text of Florida's Transportation Network Company Act which includes uninsured/underinsured motorist coverage as an insurance requirement creates an obligation for TNCs and their insurers to obtain that coverage for TNC Drivers who are actively engaged in a ride?

2.  Whether Progressive, Uber, and Rasier-DC failed to comply with their obligations under Florida law by refusing to provide indemnification to Monasterio after she suffered catastrophic injuries while transporting a passenger for Uber?

<u>**STATEMENT OF THE CASE**</u>

I.     **Statement of Facts**

      **a.  Uber accepts Monasterio's services and provides TNC insurance through Progressive Express Insurance Company.**

Uber Technologies Inc. and Rasier-DC, LLC provide an online application connecting users who request transportation to a network of drivers who stand poised to accept the passengers' request.  Doc. 30-2 and 38-1. Rasier-DC, LLC is a wholly owned subsidiary of Uber Technologies, Inc, and Rasier is the entity that actually contracts with Uber drivers for them to perform services on the Uber app. Doc. 30-4. Ms. Monasterio became a driver for Uber in January of February, 2022. Doc. 30-3, pg. 80.  At that time, she signed the Uber agreement which included a Platform Access Agreement (the "PAA").  The PAA does not comply with Florida law, but rather states that Uber may "in our sole discretion, choose to maintain auto insurance related to your Rides, but we are not required to provide you with any specific coverage for loss to you or your vehicle, unless we specifically describe it in an addendum to this PAA." Doc. 30-4.  In an unsigned addendum to the PAA Rasier disclosed that it provides insurance for "primary automobile liability insurance in the amount of $1,000,000 for death, bodily injury, and property damages.  Doc. 30-5.  The addendum to the PAA does not disclose that Rasier obtained uninsured and underinsured motor vehicle ("UM/UIM") coverage to comply with Florida law.  *Id.*

4

In March of 2022, Rasier and Uber secured a Transportation Network

Company Commercial Auto Policy through Progressive Express Insurance

Company, policy number 06250110-8 (the "Progressive Policy").  Doc. 1-1.  The

declarations page of this policy states that uninsured motorist coverage is rejected.

*Id.* at pg. 5. The Progressive Policy defines an insured as:

    a. Any **TNC driver** operating an **Insured Auto** during the above specified
period of time, who has entered into a contract with you to provide
**covered TNC operations** via the **ride-share application** and whose
contract was in force at the time of the subject accident or **loss**[1]

---

[1] The terms TNC Driver, insured auto, covered TNC operations, loss and ride-share
application are defined terms in the policy.  They are defined as follows:

TNC Driver means an individual, who is not your employee, providing
covered TNC operations;

Insured Auto means a. Any auto while being used by a TNC driver, but only
while engaged in providing a prearranged service utilizing the ride-share
application accessed using that TNC driver's valid credentials, or b. Any auto
while that auto is being operated by a person other than a TNC driver to whom you
assigned the valid credentials, while being used with the ride-share application at
the time of the accidental or loss, when all of the following apply: (i) the operator
of the auto is engaged in providing a prearranged service; and (ii) the ride-share
application was accessed using valid credentials.

Covered TNC operations means the provision of either passenger services or
non-passenger services by a natural person, and specifically excludes taxi
operations.  Only your transportation network company services that are available
in the ride-share application, and previously disclosed to us by you in your
application for insurance, or endorsement thereto, for use with valid credentials are
considered "covered TNC operations."

Loss means sudden, direct, and accidental loss or damage

Ride-share application means the digital network licensed and made
available by you that is used by a TNC driver to receive requests to provide
covered TNC operations.

*Id.* at pg. 11 (emphasis in the original). The Progressive Policy further states that it provides UM/UIM coverage if the insured pays a premium for it. *Id.* at pg. 56. As explained below, Monasterio suffered a loss which should have been covered by the UM/UIM provisions of the Progressive Policy. Doc. 30-3, pg. 116- 120. She claimed indemnification from Uber, Rasier, and Progressive in August of 2022. Doc. 30-2, pg. 7.

### b. The collision on Interstate 95.

On May 6, 2022 Monasterio logged onto the Uber mobile application and accepted a prearranged ride to transport a passenger, Bradford Cavanaugh, from the Hollywood-Fort Lauderdale Airport to Miami. Doc. 30-3, pg. 110. Around 10:45 AM, Monasterio was engaged in this prearranged ride on the Uber App and traveling southbound in the I-95 express lane when another vehicle lost control, spun over three lanes of traffic, crossed the barrier of the express lane, and slammed into Monasterio's car. Doc. 30-3, pg. 116- 120. As a result of this collision, Monasterio, who is 34 years old, is no longer able to walk because of severe injuries to her spine. Id. at pg. 123. The negligent driver, Michael Israel, did not have sufficient insurance to cover the damages he caused in the collision. Doc. 30-2, pg. 7. Consequently, Monasterio sought to recover UM benefits that she understood were in place by Uber. Id.

When Monasterio first began driving for Uber, she checked the insurance coverage provided to her by the company. Doc. 30-3, pg. 106. The information Monasterio viewed on Uber's website stated that Uber provided UM/UIM coverage for its drivers with "coverage varying by state." *Id.* Uber's website did not disclose that it had allegedly rejected UM/UIM coverage in Florida. Documents posted online by Uber and Progressive do not disclose that Uber attempted to reject UM/UIM coverage in Florida. *Id.*

## II.    Proceedings before the District Court.

Progressive filed the underlying declaratory action against Monasterio, Uber, and Rasier on July 17, 2023.  On January 25, 2024, Progressive filed its motion for summary judgment, and on the same day, Uber and Rasier filed a notice joining and adopting Progressive's motion. See Doc. 30 and Doc. 31.  Monasterio responded to the motion on February 15, 2024. Doc. 38.  Progressive then filed its reply on February 22, 2024. Doc. 41. That same day Uber and Rasier filed a separate reply and also filed a notice of joining Progressive's reply.  Doc. 42.

The district court granted summary judgment on March 19, 2024, and subsequently entered final judgment on March 27, 2024. Doc. 52 and 54, respectively. The final judgment granted the following relief:

Consistent with those Orders [on summary judgment]. . . it is hereby ORDERED and ADJUDGED that:

7

1)Final Judgment is ENTERED in favor of Plaintiff, Progressive Express Insurance Company and against Defendants Rasier-DC, LLC, Uber Technologies Inc., and Karina Monasterio on all claims brought in Plaintiff's Amended Complaint. (DE 12)

2) Consistent with the Order on Sumamry Judgment (DE 53), Plaintiff's Claim for Declaratory Judgment is adjudged as follows:

(a) Fla. Stat. §627.748 does not mandate that Progressive Express Insurance Company provide uninsured/underinsured motor vehicle insurance coverage in the Transportation Network Company Commercial Auto Policy, Policy Number 06250110-8.

(b) Progressive Express Insurance Company complied with its obligations under Fla. Stat. §627.727(2) to make available, as part of the application for the Transportation Network Company Commercial Auto Policy, Policy Number 06250110-8, uninsured and underinsured motor vehicle insurance coverage.

(c) Transportation Network Company Commercial Auto Policy, Policy Number 06250110-8, does not provide underinsured and underinsured motor vehicle insurance coverage.

By separate order, the district court requested that the parties brief the court on whether any judicial labor remained. Although, at the time, Monasterio believed her counter claims and cross claims were still active, the district court issued an order on May 16, 2024 opining that the summary judgment ruling was dispositive on all issues, and closed the case pending a mandate from this Court.

Monasterio filed her Notice of Appeal on April 19, 2024.

### III. Standard of Review

"Traditionally, decisions on 'questions of law' are 'reviewable de novo…'" *Highmark Inc. v. Allcare Health Management System, Inc.*, 572 U.S. 559, 563 (2014). When a district court enters summary judgment, the order and final judgment that relies on this order are reviewed de novo. *Byars v. Coca-Cola Co.*, 517 F.3d 1256, 1263 (11th Cir. 2008). Here, the parties' dispute involves issues of law, with little disagreement about the facts, warranting a de novo review of the district court's judgment. *Florida International University Board of Trustees v. Florida National University, Inc.*, 830 F.3d 1242 (11th Cir. 2016).

## SUMMARY OF ARGUMENT

Karina Monasterio, a 34-year old Uber driver, lost the ability to move her legs, lost sensation in her legs, and cannot walk after a driver recklessly careened into her car on May 6, 2022. It is undisputed that she was transporting a passenger for Uber/Rasier at the time of the collision. She believed Uber Technologies Inc. and Rasier-DC, LLC secured policies of insurance providing uninsured and underinsured motor vehicle coverage as required by Florida's Transportation Network Company Act ("TNC Act"), and made a claim for coverage under the applicable policy issued by Progressive Express Insurance Company. Progressive denied coverage, claiming that Uber/Rasier had rejected that coverage in January 2022.

This is a case of first impression regarding the interaction between two Florida statutes. Florida Statues section 627.748, the TNC Act, sets forth a comprehensive system of regulation for TNCs. The Act requires that TNCs "must" maintain certain insurance coverages for their drivers while the drivers are engaged in a prearranged ride. Among those requirements, the Act lists "uninsured and underinsured motorist coverage, as required by s.627.727."

The district court erred when it entered summary judgment in Progressive's favor, finding that the Act does not mandate UM/UIM coverage as a matter of law. This mistaken conclusion overlooks the plain text of the TNC Act, the intent of the Act expressed in its legislative analysis, and the purpose for the Act's provision requiring TNCs provide their drivers with UM/UIM coverage. The plain text of the Act states TNCs and their insurers "must" provide UM/UIM coverage. This plain reading does not change when the Act is read together with Florida's Statute on UM/UIM motorist coverage, section 627.727. A harmonious reading of the two, that gives meaning to each word and phrase in the laws, interprets the TNC Act to require UM/UIM coverage, with a reference to §627.727 to make clear that those provisions apply to UM/UIM insurers in the TNC context. As the district court acknowledged, the legislative history makes clear that Florida's Legislature intended to mandate UM/UIM coverage in this very situation. Finally, the purpose of the TNC Act, which uniformly regulates TNCs and codifies their unique

business model, requires TNCs to shoulder the burden of providing coverage to their drivers, especially given that the Act exempts them from providing workers' compensation insurance to their drivers.

For these reasons, the district court erred in granting summary judgment in Progressive's favor and concluding that there is no obligation to secure the insurance that the Act states TNCs "must" provide. Monasterio requests this Court reverse the district court's Final Judgment and its Order on Summary Judgment, find that the TNC Act does require that TNCs and their insurers "must" provide UM/UIM coverage for drivers actively engaged in a prearranged ride, and remand this case for further proceedings consistent with its ruling.

## ARGUMENT

I. **Florida's Transportation Network Company Act requires that businesses providing transportation services through an online application secure uninsured/underinsured motorist coverage for their drivers.**

   a. **Florida's TNC Act regulates the rideshare market with specificity to provide uniform guidelines for businesses throughout the state.**

In 2017, the Florida Legislature enacted section 627.748 (the "TNC Act") of the Florida Statutes to regulate Transportation Network Companies ("TNC") in the state, with the effect that TNCs be regulated by "uniform laws governing TNCs, TNC drivers, and TNC vehicles throughout the state." Fla. Stat. §627.748 (17)(a).

The TNC Act contains 18 separate subparagraphs which regulate a wide array of TNC issues, such as: employment status of TNC drivers (subparagraph 9), designating an agent within the state for a TNC to accept service of process (subparagraph 3), and requiring TNCs to display a photograph of the driver and license plate of the TNC vehicle before a rider enters a TNC driver's vehicle (subparagraph 5). The statute defines certain terms.[2]

This case involves the requirements of subparagraphs 7 and 8. Subparagraph 7 begins:

> (a) Beginning on July 1, 2017, a TNC driver or a TNC on behalf of the TNC driver shall maintain primary automobile insurance that:
> 1. Recognizes that the TNC driver is a  TNC driver or otherwise uses a vehicle to transport riders for compensation; and
> 2. Covers the TNC driver while the TNC driver is logged on to the digital network of the TNC or while the TNC driver is engaged in a prearranged ride.

---

[2]TNC, TNC driver, TNC vehicle, and Prearranged ride are each statutory defined term.

"TNC" means a Transportation Network Company who uses a digital network to connect riders to TNC driver, who provide prearranged ride for compensation. Fla. Stat. §627.748(1)(e)

"TNC driver" means an individual who, in return for compensation, uses a uses a TNC vehicle to offer or provide prearranged rides. Fla. Stat. §627.748(1)(g)

"TNC vehicle" means a vehicle that is not a taxicab or a jitney that is used by a TNC driver to offer or provide a prearranged ride and is owned, leased, or otherwise authorized to be used by a TNC driver. Fla. Stat. §627.748(1)(h)

"Prearranged ride" means provision of transportation by a TNC driver to a rider beginning when the TNC driver accepts the ride request, continuing while the driver transports the rider, and ending when the last rider exits from and is no longer occupying the TNC vehicle. Fla. Stat. §627.748(1)(b)

It is undisputed that at the time of this incident, Monasterio was engaged in a prearranged ride, therefore Fla. Stat. 627.748(7)(c) applies:

(c) The following automobile insurance requirements apply while a TNC driver is engaged in a prearranged ride:

  a. Automobile insurance that provides:
    i. A primary automobile liability coverage of at least $1 million for death, bodily injury, and property damage;
    ii. Personal injury protection benefits that meet the minimum coverage amounts required of a limousine under ss. 627.730-627.7405; and
    iii. Uninsured and underinsured vehicle coverage as required by s. 627.727.

  b. The coverage requirements of this paragraph may be satisfied by any of the following:
    i. Automobile insurance maintained by the TNC driver or the TNC vehicle owner;
    ii. Automobile insurance maintained by the TNC; or
    iii. A combination of sub-subparagraphs a. and b.

The law goes on to explain:

(d) If the TNC driver's insurance under paragraph (b) or (c) has lapsed or does not provide the required coverage, the insurance maintained by the TNC **must** provide the coverage required under this subsection, beginning with the first dollar of a claim, and have a duty to defend such claim.

In subparagraph 8, the law requires that TNCs disclose, in writing, to their TNC drivers "[t]he insurance coverage, including the types of coverage and limits for each coverage, which the TNC provides while the TNC driver uses a TNC vehicle in connection with the TNC's digital network." Fla. Stat. §627.748(8)(A)(1.).

13

To quell any doubt about the insurance requirements under the TNC Act, the Florida Legislature issued a "House of Representative's Final Bill Analysis" on May 11, 2017, after the law had passed both chambers of the legislature and had been signed by the governor. Transportation Network Companies Act of 2017, Fla. H.B. 221, Fla S.B. 340 "House of Representatives Final Bill Analysis" (May 11, 2017). The TNC Act was approved by the Florida House of Representatives on April 5, 2017, approved by the Florida Senate on April 19, 2017, and signed by the Governor on May 9, 2017. In this analysis, they state that the TNC Act provides a regulatory framework for TNCs with "minimum insurance requirements for TNCs and TNC drivers." The analysis explains it was the intention of the Florida Legislature that:

> "When a TNC driver is engaged in a prearranged ride, the automobile insurance must provide:
>
> • Primary automobile liability coverage of at least $1 million for death, bodily injury, and property damage.
> • Personal injury protection benefits that meet the minimum coverage amounts required of a limousine under the Florida Motor Vehicle No-Fault Law. Pursuant to s. 627.733(1)(a), F.S., limousines are exempt from the Florida Motor Vehicle No-Fault Law. However, if the Legislature removes this exemption or makes certain parts of the Florida Motor Vehicle No-Fault Law applicable to limousines, the changes in that law would also apply to TNCs and their drivers.
> • Uninsured and underinsured vehicle coverage."

*Id*. at p. 5. This analysis clarifies that the Legislature intended TNCs and their drivers to have uninsured/underinsured motorist coverage in place when TNC drivers are engaged in a  prearranged ride.

14

The TNC Act's scope is broader than simply stating insurance requirements for TNCs. The Act also allows a TNC Driver's personal auto insurance carrier to exclude coverage while the TNC Driver is logged onto the digital network or engaged in a prearranged ride. Fla. Stat. §627.748(8)(b)(1.). The Act further requires that TNCs cooperate with personal auto insurers and "immediately" provide personal auto insurers with the precise times that the TNC Driver was logged onto the digital network in the 12 hours before and 12 hours following a collision. Fla. Stat. §627.748(8)(d). The practical effect of subsection (8) is that the risk associated with the TNC's business is not shouldered by personal insurers for TNC drivers, but rather by the TNC and its insurers, as it is the TNC that is increasing zones of risk by sending fleets of personal vehicles into the roadways. The TNC Act allows TNCs to use drivers with no training other than the limited preparation drivers undertake to pass the driving test and obtain a drivers license. Fla. Stat. §627.748(12)(a)(1.).

The intent of the TNC Act is that TNCs be regulated by "uniform laws governing TNCs, TNC drivers, and TNC vehicles throughout the state." *Checker Cab Operators, Inc. v. Miami-Dade County*, 899 F.3d 908 (11th Cir. 2018) (quoting Fla. Stat. §627.748(17)(a)). TNCs revolutionized the transportation industry by potentially turning each and every automobile on the road into a vehicle for hire. At any moment, just about any driver, in any car, can download the Uber app and ferry a passenger from point a to point b. A central issue to this case is whether Uber,

Rasier, and Progressive can ignore the plain text of section 627.748 and leave this mass of TNC drivers without mandated insurance coverage.

The text of the law squarely addresses the inseparable insurance issues created by TNCs. Subparagraph seven is titled "Transportation Network Company and TNC Driver Insurance Requirements." It begins, fundamentally changing the insurance marketplace in Florida, by requiring that "a TNC driver, or a TNC on behalf of the TNC driver shall maintain primary automobile insurance that: 1. Recognizes that the TNC driver is a TNC driver. . . and 2. Covers the TNC driver while the TNC driver is logged on to the digital network of the TNC or. . . is engaged in a prearranged ride." Sub subsections (b) and (c) detail the "automobile insurance requirements that apply" while a TNC driver is logged onto the Uber application or engaged in a prearranged ride, respectively. Fla. Stat. §627.748(7)(b) and (c).

Here, Ms. Monasterio was engaged in a prearranged ride and therefore the following "insurance requirements apply":

> 1. Automobile insurance that provides:
>      a. a primary automobile liability coverage of at least $1 million for death, bodily injury, and property damage;
>      b. Personal injury protection benefits that meet the minimum coverage amounts provided of a limousine under ss. 627.730-627.7405; and
>      c. Uninsured and underinsured motorist coverage as required by s. 627.727.

Fla. Stat. §627.748(7)(c)(1.)(a.)-(c.). The coverages described above may be satisfied by: (1) insurance maintained by the TNC driver or vehicle owner; (2) by

the TNC itself; or (3) by any combination of the first two. Fla. Stat. §627.748(7)(c)(2.). However, if the TNC driver's personal insurance "has lapsed or does not provide the required coverage, the insurance maintained by the TNC **must** provide the coverage required under this subsection, beginning with the first dollar of a claim. . ." Fla. Stat. §627.748(7)(d).

The text of the TNC Act leads to only one conclusion- the insurance requirements at the time of Ms. Monasterio's injury included UM/UIM. The district court erred by concluding that the phrase "required by s. 627.727" modifies the plain language of the statute allows a TNC and its insurer to ignore the requirements of section 627.748. Well established cannons of statutory interpretation require this Court to reject that conclusion.

### b. Florida Transportation Network Act must be read to give meaning to each of its provisions.

The text of the TNC Act requires TNCs to provide certain insurance coverage to their drivers. First, "a statute must be given its plain and obvious meaning." *Fla. Dept. of Environmental Protection v. ContractPoint Florida Parks, LLC*, 986 So.2d 1260, 1265 (Fla. 2008). "Every statute must be read as a whole with meaning ascribed to every portion and due regard given to the semantic and contextual interrelationship between its parts." *Id*. (internal citations omitted). "A statute should be interpreted to give effect to every clause in it, and to accord meaning and harmony to all of its parts. . ." *Id*. "Ordinarily, when a specific provision conflicts with a

general one, the specific governs." *Edmond v. United States*, 520 U.S. 651, 657 (1997).

The plain meaning of the phrase "insurance requirements" is that the listed coverages, including UM/UIM are required. The law requires an TNC and its insurer to pay those claims "beginning with the first dollar." Fla. Stat. §627.748(7)(d). Thus, the requirement to obtain UM/UIM coverage is controlled by the TNC Act.

Contrary to the district court's conclusion, the phrase "as required by s.627.727" does not allow Rasier to reject, or Progressive to fail to provide UM/UIM insurance coverage. When one statute specifically refers to the another, the two should be read *in pari materia*. *United Petro/Energy Corp. v. U.S.*, 846 F.Supp. 993, 997 (S.D. Fla. 1994). Courts must construe statutes on the same subject harmoniously, and, if possible, give effect to every provision in both. SINGER, NORMAN AND SINGER, J.D. SHAMBIE, STATUTES AND STATUTORY CONSTRUCTION, §51.2 (2012). "Where one statute deals with a subject in general terms and another deals with a part of the same subject in a more detailed way, the two should be harmonized if possible." *Id*. at §51.5. Generally, the words in a statute should be given their ordinary meaning, and when this ordinary meaning produces a "contextual harmonization," such meaning will control. SUMMERS, ROBERT, STATUTORY INTERPRETATION IN THE UNITED STATES, Interpreting Statutes, 434-441 (1991). Statutory texts must be construed "reasonably, to contain all that it fairly

means," recognizing, "[in] textual interpretation, context is everything." ANTONIN SCALIA, COMMON LAW COURTS IN A CIVIL LAW SYSTEM: THE ROLE OF UNITED STATES FEDERAL COURTS IN INTERPRETING THE CONSTITUTION AND LAWS, IN A MATTER OF INTERPRETATION: FEDERAL COURTS AND THE LAW, 23 (Amy Gutmann ed., 1997).

The phrase "as required by s.627.727" refers to and invokes the entire section of Florida statues that regulates UM/UIM insurance. This section provides a detailed regulation of UM/UIM coverage, and informs the TNC Act, as a whole, that aside from the specific "insurance requirement" found in the TNC Act, other provisions of §627.727 apply. For example, §627.727, subsection (2) addresses the applicable limits of insurance, and requires limits in an amount equal to the bodily injury liability insurance as a default; subsection (3) defines UM/UIM coverage and describes its applicability; subsections (4) and (5) relate to insolvent insurers; subsection (6) explains the process of settling with an uninsured or underinsured motorist and injured parties duties to keep the UM/UIM insurer apprised of the settlement. *See generally* Fla. Stat. §627.727. This entire statutory scheme is invoked by the words "as required by s.627.727," to myopically conclude that "as required by s.627.727" simply excuses TNCs and their insurers from providing UM/UIM coverage is error.

Therefore, to read the two statutes together, harmoniously, it is logical to conclude that the TNC Act mandates UM/UIM coverage as an "insurance requirement" and by referencing section 627.727, the legislature invoked the law that relates to UM/UIM coverage generally.

The district court erred when it concluded that, because Fla. Stat. 627.727(1) does not expressly require UM/UIM coverage for policies that do not insure a specific vehicle, the "insurance requirement" for UM/UIM found in Fla. Stat. 627.748 has no meaning. Fla. Stat. 627.727(1) provides:

> (1) No motor vehicle liability insurance policy which provides bodily injury liability coverage shall be delivered or issued for delivery in this state with respect to any specifically insured or identified motor vehicle registered or principally garaged in this state unless uninsured motor vehicle coverage is provided therein or supplemental thereto for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury, sickness, or disease, including death, resulting therefrom. However, the coverage required under this section is not applicable when, or to the extent that, an insured named in the policy makes a written rejection of the coverage on behalf of all insureds under the policy...

Written rejections of UM/UIM coverage, therefore, are only effective, under Florida law, for policies "issued for delivery in this state **with respect to any specifically insured or identified motor vehicle**." *Id*. No other subsection of §627.727 limits its applicability to specifically insured or identified motor vehicles. For instance, Subsection (9), which relates to stacking of UM/UIM benefits, states "Insurers may offer policies of uninsured motorist coverage containing policy provisions. . ."

20

without limiting the subsections applicability to specifically insured or identified motor vehicles. Fla. Stat. §627.727(9)(a)-(e).

The Progressive Policy is not issued for specifically insured or identified vehicles. Rather, Progressive's "Florida Transportation Network Company Commercial Auto Policy" provides coverage to "any auto while being used by a TNC driver, but only while engaged in providing a prearranged service utilizing the ride-share application accessed using that TNC driver's valid credentials…" See Doc. 1-1 , pg. 3. This definition of "insured auto" is far from a specifically insured or identified vehicle. If no one in Florida is using their car as a TNC driver to provide a prearranged ride, then this policy does not insure a single vehicle. Conversely, if every single Florida resident were to be engaged in a prearranged ride for Uber at once, this policy would cover every car in Florida. Potentially, the policy can cover any combination of autos in the state.

The district court concluded that, because subsection (1) of §627.727 is the only subsection of the UM/UIM law where insurers are required to include UM/UIM absent a written rejection, and that because the Progressive Policy does not insure a specific motor vehicle, therefore insurers of TNCs have no obligation to provide UM/UIM. This interpretation flies in the face of the plain language of Fla. Stat. §627.748(7)(c)(2.) and §627.748(7)(d). If the effect of the TNC Act which requires TNC to provide certain insurance requirements beginning with the first dollar, is that

those requirements are meaningless, then why write that subsection into the statute at all? The district court acknowledged that the intent of the TNC act is to require TNCs and their insurers to provide UM/UIM coverage. Doc. 52, pg. 8 ("By referencing the Florida UM/UIM Statute, the TNC Act makes the requirement for UM/UIM coverage meaningless for TNC insurance policies. I agree with Ms. Monasterio that this interpretation might be counter to the Florida Legislature's intent when they drafted the TNC Act."). Yet it concluded that, in the district court's reading of the TNC Act, the "insurance requirement" to provide UM/UIM coverage to TNC Drivers has no meaning. *Id*. Every statute must be read as a whole, with meaning given to each part, therefore, any conflict between the TNC Act and section 627.727 requires this Court to conclude the TNC Act is ambiguous and to look to the legislative intent.

When a statute is "susceptible to more than one reasonable interpretation," it is ambiguous. *Kelly v. Sabretech, Inc.*, 106 F. Supp.2d 1283, 1287 (S.D. Fla. 1999) (quoting *Breedlove v. Earthgrains Baking Companies, Inc.*, 140 F.3d 797 (8th Cir. 1998). The "long-standing" principle is that when two statutes conflict, the more recent or more specific statute controls. *Tug Allie-B, Inc. v. United States*, 273 F.3d 936, 948-49 (11th Cir. 2001). "Where the plain text of the statute is in inescapable conflict, the Florida Supreme Court has repeatedly looked to legislative staff analyses, which it has described as 'one touchstone of the collective legislative will."

*Robbins v. Garrison Prop. & Cas. Ins. Co.*, 809 F.3d 583, 587 (11th Cir. 2015) (quoting *Am. Home Assurance Co. v. Plaza Materials Corp.*, 908 So.2d 360 (Fla. 2005)). When courts "[encounter] inconsistency in the statutes when they are read in tandem, we look to their legislative history." *Alexdex Corp. v. Nachon Enterprises, Inc.*, 641 So.2d 858, 861 (Fla. 1994) (further reasoning "We now have two statutes that when considered separately are clear, precise, and their meanings understandable; yet when taken together they are inconsistent."). Here, the Court must look to the intent of the Florida Legislature when passing the TNC Act.

In *American Home*, the Florida Supreme Court interpreted two conflicting provisions of Florida's law concerning mechanic's liens in construction projects. *Am. Home Assurance Co.*, 908 So.2d at 362. One set of provisions required certain notices to be sent at the commencement of a subcontractor's work and at the completion of the subcontractor's work before any action to enforce a lien against a surety bond could be filed. *Id*. at 363-64. The other set of provisions required that notice of these pre-suit conditions be placed explicitly placed in the text of the bond. *Id*. In *American Home*, the subcontractor suing for payment did not comply with the pre-suit notice provision; neither did the bond company comply with the requirement of placing explicit warnings in the text of the bond. *Id*. They reasoned that co-equal provisions in statues cannot be rendered "nugatory." *Id*. at 365. Further reasoning that "the Legislature does not intend to enact useless provisions, and courts should

avoid readings that would render part of a statute meaningless," they declined to render either set of statutory provisions "without operation" by selecting one or the other for primacy. *Id*. at 366. The Florida Supreme Court then relied on the legislative staff analysis, calling it an "invaluable tool," in line with Florida jurisprudence and "well-established" Florida precedent. *Id*. at 369.

The Florida Legislature's intent is memorialized in the Transportation Network Companies Act of 2017, Fla. H.B. 221, Fla S.B. 340 "House of Representatives Final Bill Analysis." That analysis is telling in what it includes, and what it omits. It states:

> "When a TNC driver is engaged in a prearranged ride, the automobile insurance must provide:
>
> • Primary automobile liability coverage of at least $1 million for death, bodily injury, and property damage.
> • Personal injury protection benefits that meet the minimum coverage amounts required of a limousine under the Florida Motor Vehicle No-Fault Law. Pursuant to s. 627.733(1)(a), F.S., limousines are exempt from the Florida Motor Vehicle No-Fault Law. However, if the Legislature removes this exemption or makes certain parts of the Florida Motor Vehicle No-Fault Law applicable to limousines, the changes in that law would also apply to TNCs and their drivers.
> • Uninsured and underinsured vehicle coverage."

Doc. 38-3, pg. 5. The second bullet point readily concedes that the personal injury protection section is tied to the limousine requirements, and that although limousines are currently exempt from personal injury protection coverage, any future change in the law would automatically apply to TNC drivers. There is no such discussion

about UM/UIM coverage. The third bullet point plainly states that UM/UIM vehicle coverage is an "insurance requirement" under the TNC Act.

Progressive's interpretation of the TNC Act is contrary to both the plain language of the TNC Act and its legislative intent. As in *American Home*, here two co-equal statutory provisions are in conflict. On one hand, the TNC Act provides "insurance requirements" that list "uninsured/underinsured motorist coverage as required by s.627.727" as a mandated coverage, and further requires that TNCs and their insurers "must" provide that coverage "beginning with the first dollar of a claim." See Fla. Stat. 627.748(7)(d). On the other hand, the district court held that Fla. Stat. 627.727 generally does not require UM/UIM coverage for insurance policies unless they are issued to specifically identified motor vehicles, and that "Ms. Monasterio cannot point to any text in Florida UM/UIM Statute that would require coverage for her vehicle during the May 6, 2022 incident." See Doc. 52, pg. 7-8. The plain reading of the TNC Act conflicts with the district court's interpretation of the interplay between the TNC Act and the UM/UIM Statute. The district court acknowledged that its interpretation of this interplay "makes the requirement for UM/UIM coverage meaningless for TNC insurance policies." Doc. 52, pg. 8. The district court's interpretation, therefore, is contrary to Florida's "elementary" legal principle that significance and effect be given to each word or phrase in a statute. Additionally, the district court erroneously concluded that the Progressive Policy did

not provide UM/UIM coverage because Uber/Rasier did not pay the UM/UIM premium. See *Mercury Ins. Co. of Florida v. Anatkov*, 929 So.2d 624 (Fla. 3d DCA 2006)(rejecting the insurer's argument that no UM/UIM coverage was provided because the insured failed to pay a UM/UIM premium because, as no written rejection was obtained, the insured was entitled to UM/UIM "by operation of law.").

Using the well-established cannons of statutory interpretation, section 627.748, the specific statute about insurance requirements for TNC drivers, must be read harmoniously with section 627.727, the general statute about UM/UIM insurance. Thus, the phrase "as required by s.627.727" must mean a general reference to all of the regulations relating to UM/UIM coverage. The requirement that TNCs provide insurance for their drivers, and that such insurance contain UM/UIM coverage is borne by the plain text of section 627.748, and that requirement is not somehow abridged by language in §627.727(1) relating to "specifically insured or identified motor vehicles" or voided because other subsections of §627.727 don't expressly require UM/UIM from TNCs. The plain text of §627.748 contains an independent requirement for UM/UIM coverage, "starting with the first dollar of the claim."

Monasterio's harmonious reading of the TNC Act and section 627.727 gives effect to "each word, phrase, sentence, and part of the statute." *Am. Home*, 908 So.2d at 367. In Monasterio's harmonious reading the phrase "as required by s.627.727"

clarifies that TNC's UM/UIM coverage, although novel due to the cutting-edge technology of mobile networks, is still governed by the same rules that apply to traditional UM/UIM insurers. Therefore, the district court's order on summary judgment must be reversed, and this case must be remanded with instruction to deny Progressive's summary judgment.

### c. The district court's interpretation of the Transportation Network Act leaves thousands of Floridians without adequate insurance.

The TNC Act became law in 2017, because Uber revolutionized the taxi industry, often by entering a market before receiving government approval. When Uber first began operating in Florida, it did so illegally. Carlos Ibarcena, *Going Under the Hood: The Winners and Losers of Florida's Transportation Network Companies Law*, 42 NOVALR 45, 47 (Fall 2017). Part of Uber's business model included gaining a competitive advantage over traditional transportation companies by eschewing compliance with regulatory requirements. *Id*. As some local municipalities enacted regulations to permit TNCs, other local governments in Florida flatly refused to permit TNCs at all. *Id*. at 48. Under this hodgepodge of local laws, insurance issues arose due to gaps in coverage on personal auto policies, inadequate insurance amounts, and fraud by TNC drivers who omitted their status on accident reports. *Id*. at 52. By enacting section 627.748, the legislature sought to regulate this activity completely, balancing the needs of TNCs with the increased risk they create.

Progressive, Uber, and Rasier seek to continue these early practices now.  The

TNC Act regulates a wide aspect of TNC conduct, giving TNCs important legal

protections such as: limiting the TNC's liability, declaring TNC drivers independent

contractors (and therefore ineligible to receive workers' compensation benefits), and

allowing a TNC driver's own auto policy to exclude coverage when they are engaged

in a prearranged ride.  It is that last provision that leads to an absurd result if the

Court adopts Progressives' view of the law. Section 627.748(8)(b)(1.) allows:

(b)1.    An insurer that provides an automobile liability insurance policy under this
part may exclude any and all coverage afforded under the policy issued to an
owner or operator of a TNC vehicle while driving that vehicle for any loss or
injury that occurs while a TNC driver is logged on to a digital network or while a
TNC driver provides a prearranged ride. Exclusions imposed under this subsection
are limited to coverage while a TNC driver is logged on to a digital network or
while a TNC driver provides a prearranged ride. This right to exclude all coverage
may apply to any coverage included in an automobile insurance policy, including,
but not limited to:
   a.   Liability coverage for bodily injury and property damage;
   b.   Uninsured and underinsured motorist coverage;
   c.   Medical payments coverage;
   d.   Comprehensive physical damage coverage;
   e.   Collision physical damage coverage; and
   f.   Personal injury protection.

Therefore, non-TNC insurers can deny coverage to TNC drivers if they are engaged

in a ride for Uber.  This leaves TNC-provided insurance, like the Progressive Policy,

as the only source of coverage for thousands of vehicles traveling Florida's roads

every day.  These drivers perform services for Uber, and accept significant

limitations in their abilities to assert rights afforded to them in a traditional employment context. In exchange, the TNC must simply provide required coverages while they are on the road. The legislative analysis of the TNC Act supports this concern, stating, "[t]he bill provides that is the TNC driver's insurance policy had lapsed or does not provide the required coverage, the insurance maintained by the TNC must provide coverage… Coverage under an automobile insurance policy maintained by the TNC must not be dependent on a personal automobile insurer first denying a claim." Doc. 38-3, pg. 5.

This give and take is logical. TNCs place thousands of amateur drivers on the roadways to act as their service providers. The service provides access to travel, medical appointments, food, and the workplace for many who need a ride. However, there are also increased risks. Public roads see an increased risk of car traffic, sudden stops to pick up and drop off passengers by drivers who are not trained as taxis or limousines, partially disabled drivers who use TNCs to supplement income, and drivers who may not be familiar with the place they are traveling to. It is logical to protect them, and their passengers, from the risks of the roadways while they further Uber's business. Because the law allows personal insurance carriers to exclude coverage while engaged in these rides, Uber's policy is the single remaining option for insurance protection.

This case is an excellent example of a claimant who needs that protection. Monasterio was injured through no fault of her own, and became permanently disabled at the age of 34. Allowing the involved corporate parties to creatively interpret the law to lower their own costs leaves Monasterio to the government and to charity as caregivers. In the aggregate, Progressive's position in this suit will cost society millions, as Uber sends drivers into hazardous roadways, and then disavows them when they are injured while serving the company.

Passengers will also be left unprotected from un- or underinsured drivers. The increased risk to passengers is more alarming because, while Uber, Rasier, and Progressive have an obligation to disclose insurance coverages to their drivers, many passengers are altogether oblivious that the multi-billion dollar company they patronize, is hanging them out with no UM/UIM coverage.

It is absurd to think that this result was intended by the legislature when passing the TNC Act. It is absurd to conclude that this law intentionally places the burden to care for persons injured by un- and underinsured motorist during an Uber ride on society rather than on the enterprise creating, promoting, and profiting from this increased risk. Progressive's interpretation of the act, while beneficial to them and their client, leaves thousands of Floridians unprotected and unaware. For this additional reason, the district court's judgment must be reversed.

## II. Uber and Rasier-DC, violated the law by refusing to provide legally mandated indemnification.

The TNC Act places an obligation on TNCs, like Uber and Rasier, to obtain the necessary coverages mandated by the Act. As detailed above, the "insurance requirements" set forth in section 627.748(7)(c) "may be satisfied by any of the following. . . b. Automobile insurance maintained by the TNC." See Fla. Stat. 627.748(7)(c)(2.).  When the TNC Driver's personal insurance either lapses or does not provide the required coverage, "the insurance maintained by the TNC must provide the coverage required under this subsection. . ." Fla. Stat. §627.748(7)(d). Regardless of whether the Progressive Policy actually provided UM/UIM coverage here, Uber/Rasier had an independent statutory obligation to secure UM/UIM coverage for Monasterio.

This independent duty further supports Monasterio's harmonious reading of the TNC Act and section 627.727.  The district court wrongly reasoned that, because the Progressive Policy did not insure a specifically identified motor vehicle, and because section 627.727(1) only mandates UM/UIM coverage for specifically identified motor vehicles, therefore, Progressive was under no obligation to provide UM/UIM coverage to Monasterio. But the district court did not consider that Uber/Rasier had an independent obligation to secure that coverage.  This independent obligation, found in the TNC Act, makes no mention of insurance policies for specifically identified motor vehicles, and is therefore, not

31

dependent on the language in section 627.727(1). The independent duty that "the insurance maintained by the TNC must provide the coverage required under this subsection" is not limited by what kind of policy Uber/Rasier purchase, whether they purchase individual policies for each driver, individual policies for TNC Vehicles, or blanket policies covering all actual or potential TNC Drivers. The TNC Act allows Uber/Rasier and Progressive the freedom to craft those insurance relationships in ways that best fit their business needs, as long as the end result meet the insurance requirements the Act mandates.

The TNC Act highlights this independent duty by specifically allowing TNC Driver's personal auto policies to deny and exclude coverage when TNC Drivers are engaged in prearranged rides, or otherwise logged onto the TNC Network. Rather than comply with the statutory mandate, Uber/Rasier attempted to circumvent the law by signing a UM/UIM rejection form. See Doc. 1-1, pg. 3-4. There is no legal authority for them to do so. Nothing in the TNC Act authorizes a TNC to reject UM/UIM on behalf of all of their TNC Drivers. Instead, the clear intent of the Act is that TNC Drivers be protected by insurance, and that the TNC Driver's personal insurance be relieved of the additional risk created by Uber/Rasier when it sends TNC Drivers out into the roadways. For this additional reason, the district court's judgment must be reversed.

## CONCLUSION

For all the foregoing reasons, the final judgment must be reversed, and this Court should remand this case to the district court with instruction to deny Progressive's motion for summary judgment, which Uber and Rasier joined, and hold any additional proceedings deemed necessary to provide justice in this case.

Respectfully submitted,

H. Clay Roberts, Esq.
Javier A. Basnuevo, Esq.
Roberts, P.A.
113 Almeria Avenue
Coral Gables, FL 33134
Phone: 305-442-1700
roberts@robertspa.com
basnuevo@robertspa.com

By:    /s/ Javier A. Basnuevo
       Javier A. Basnuevo, Esquire
         (Fla. Bar No.: 100509)

## <u>CERTIFICATE OF COUNSEL</u>

Undersigned counsel certifies that this document complies with Rule 32(g),

the number of words in this Opening Brief are 7176.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on July 3, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which will send a notice of electronic filing to all counsel of record.

ROBERTS, BASNUEVO & MACIAS, P.A.
Attorneys for Appellant, Karina Monasterio
113 Almeria Avenue
Coral Gables, Fl 33134
Telephone:  305-442-1700
Fax:  305-442-2559
E-mail:  basnuevo@robertspa.com

By:    /s/ Javier A. Basnuevo
         Javier A. Basnuevo, Esquire
         (Fla. Bar No.: 100509)